**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **MAURICE SIMMONS,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **Civil Action No. 3:05-CV-1921-K (BH)** |
| | § | |
| **CADENCE DESIGN SYSTEMS, INC.,** | § | |
| | § | |
| **Defendant.** | § | **Pretrial Management** |

## FINDINGS, CONCLUSIONS, AND RECOMMENDATIONS

Pursuant to the District Court's *Standing Order of Reference*, filed March 1, 2006, this case was referred to this Court for pretrial management, including the determination of non-dispositive motions and issuance of findings of fact and recommendations to the District Court on dispositive motions. Before the Court are the following:

(1) *Defendant's Motion for Summary Judgment* ("Mot."), filed July 20, 2007;

(2) *Brief in Support of Defendant's Motion for Summary Judgment* ("Mot. Br."), filed July 20, 2007;

(3) *Defendant Cadence Design Systems, Inc.'s Appendix of Evidence in Support of Motion for Summary Judgment* ("Def. App."), filed July 20, 2007;

(4) *Plaintiff's Response to Defendant's Motion for Summary Judgment* ("Mot. Resp."), filed September 4, 2007;

(5) *Plaintiff's Appendix in Support of Evidence in Support to Deny Defendant's Motion for Summary Judgment* ("Pl. App."), filed September 4, 2007;[1] and

---

[1] The majority of Plaintiff's appendix is the same as Defendant's. (*See* Pl. App.; *cf.* Def. App.) Because Defendant's appendix is numbered and authenticated, the Court refers to it throughout these findings for ease of reference with the exception of Plaintiff's two sworn affidavits. The "Declaration of Maurice B. Simmons" and the "Second Declaration of Maurice B. Simmons" are also unnumbered in part; and the first page of Plaintiff's "Declaration" is hereby designated as page 1A, and the four pages that comprise Plaintiff's "Second Declaration" are designated as pages 15-18.

(6)     *Reply in Further Support of Defendant's Motion for Summary Judgment*
        ("Mot. Reply"), filed September 18, 2007.

Having reviewed the pertinent filings above and the law applicable to the issues raised, the Court

finds that *Defendant's Motion for Summary Judgment* should be **GRANTED.**

## I. FACTUAL BACKGROUND

Defendant Cadence Design Systems, Inc. ("Cadence") is a global technology and

engineering services company with a regional office in Plano, Texas. (Def. App. at 1, ¶3). Cadence

customers use its software and hardware, methodologies, and services to design and verify advanced

semiconductors, printed circuit boards and systems used in consumer electronics, networking and

telecommunications equipment, and computer systems. *Id.* In February of 2001, Cadence hired

Plaintiff Maurice Simmons ("Plaintiff") to work as an Applications Engineer at level 3 ("AE3") of

Cadence's pay and classification scheme for AEs. (Def. App. at 141). As an AE3, Plaintiff was

expected to be proficient in Cadence software tools, present and explain the proper application of

software tools to customers, and work well with colleagues and customers. (Def. App. at 1, ¶5; Pl.

App. at 1A, ¶5). Plaintiff's compensation consisted of both a base salary, which was near the top

of the pay grade for AE3, and incentive bonus opportunities. (Def. App. at 7, ¶35). Bonuses at

Cadence are dependent on individual, team, and overall company performance. *Id.*

In January of 2003, AE Director Douglas Rock became Plaintiff's supervisor. (Def. App.

at 1-2, ¶¶2, 7; Pl. App. at 1, ¶7). Shortly after Mr. Rock began, he requested that Plaintiff and

Matthew Nguyen, both of whom primarily worked from their home, be present at the Cadence office

in Plano every day during the workweek. (Def. App. at 2, ¶7; Def. App. at 11-12; Pl. App. at 1, ¶7).

Mr. Rock avers that Plaintiff requested to continue working from home when not onsite with a

customer due to his family situation and long commute. (Def. App. at 2, ¶7; Pl. App. at 1, ¶7). He

- 2 -

approved the request. *Id*. Mr. Rock indicates that he initially had a cubicle assignment for both Plaintiff and Mr. Nguyen, but upon designating Plaintiff as a "home office" employee, he did not assign a permanent cubicle to Plaintiff since no other "home office" employee had an assigned cubicle at the time. (Def. App. at 2, ¶7; Def. App. at 11). Plaintiff avers that he does not recall requesting the "home office" designation. (Pl. App. at 1, ¶7). He also avers that other Cadence employees who were not frequently in the office had assigned cubicles, but he provides neither the names nor the races of these individuals. *Id*.

In the summer of 2003, Cadence underwent a periodic company-wide reduction in force. (Def. App. at 2,¶8; Pl. App. at 1, ¶8). Mr. Rock selected two employees, neither of which were of Plaintiff's race, from his AE group to lay off. *Id*. Plaintiff avers that Mr. Nguyen was one of the employees Mr. Rock laid off. (Resp. Br. at 1, ¶¶8, 9). The record does not reflect whether the employees laid off were designated as "home office" employees.

Around the time of the summer 2003 layoffs, Mr. Rock forwarded email jokes or stories to his work group in what he described as "an effort to boost morale." (Def. App. at 2, ¶9). One story, sent on July 9, 2003, updated Aesop's fable of the ant and the grasshopper. (Def. App. at 289-91). The modern version sent by Mr. Rock involved celebrities such as Oprah Winfrey and Jesse Jackson calling attention to the plight of the starving grasshopper; the moral of the story was to "vote Republican." *Id*. at 291. Plaintiff, an African-American, found this "vote Republican" email to be racially offensive and harassing because he believed it depicted African-Americans in a negative light. (Pl. App. at 1, ¶9; *see* Resp. Br. at 21). On August 12, 2003, Mr. Rock sent out an email entitled "Dilemma"; the punch line involved running over an elderly woman, having intercourse against a bus stop sign, and drinking beer. (Def. App. at 293). Plaintiff, a male, found this email to be misogynistic. (Pl. App. at 1, ¶9; *see* Resp. Br. at 21). Although Plaintiff was aware of

Cadence's policy prohibiting discrimination and harassment in any form, he neither complained to Mr. Rock or anyone in human resources ("HR") or management prior to May of 2004 regarding the email messages he found offensive, nor did he complain to anyone in HR or management about any form of perceived harassment. (Pl. App. at 1, ¶9; Def. App. at 2, ¶9; Def. App. at 143-44, 296-98).

Plaintiff avers that in October of 2003, Mr. Rock conspired to set him up for failure by having Anand Belram, Mr. Rock's manager, assign Plaintiff to a "highly political and highly complicated" project. (Pl. App. at 2, ¶10). This project was known as the "Blacktie/StaticCheck evaluation," and involved assessing the overlap between Cadence's existing programs and a newly acquired company's software. *Id.* Because the objective was to address the potentially overlapping systems, Plaintiff believed he "would likely be hated by one group or the other." *Id.*

In late 2003, Mr. Rock learned from Anil Gupta, a Technical Account Manager ("TAM")[2] assigned to work at Texas Instruments ("TI") along with Plaintiff, that TI was concerned about the pace of the project to which Plaintiff was assigned. (Def. App. at 7, ¶11). In an email dated January 29, 2004, Mr. Rock conveyed the concerns reported by Mr. Gupta about the project delay to Plaintiff. Def. App. at 2, ¶11). He then assigned Bob Hilker, Cadence's Senior Sales Technical Leader, to lead the TI project and mentor Plaintiff. *Id.* Plaintiff disputes Mr. Gupta's characterization and avers that there was no delay because complex projects can take several months to complete, rather than the 2 weeks typically needed to complete a benchmark project. (Pl. App. at 3, ¶11). However, neither party provides any information whether Plaintiff was also assigned to "typical" projects at TI.

On February 2, 2004, Mr. Rock received an email from Chris Dietrich, the Core Competency

---

[2]TAMs work parallel to AEs and are responsible for determining the client's needs and expectations and setting benchmarks so that those needs and expectations are met by the AEs. (Def. App. at 2, ¶6).

Manager working with Plaintiff. Mr. Dietrich expressed frustration with Plaintiff's performance and excessive need for assistance, a complaint he said was common among Cadence employees working on the TI project with Plaintiff. (Def. App. at 3, ¶¶12, 13; Def. App. at 14). The following day, Mr. Rock requested additional input, both good and bad, from others who had worked with Plaintiff during 2003; Mr. Rock assured the recipients of his request that their input would be anonymous. (Def. App. at 3, ¶14; Def. App. at 16-19). According to Mr. Rock's summary of the peer feedback, Plaintiff lacked the higher thinking skills necessary to function effectively as an AE3 and needed basic help performing his job functions. *Id.*

In February of 2004, Plaintiff received his 2003 performance review. Annual performance reviews at Cadence combine the employee's own assessment of his performance with manager input. (*See* Def. App. at 21-22). Plaintiff evaluated his performance in 2003 as "outstanding" and that he "exceeded expectations across the board." (Def. App. at 21). Mr. Rock incorporated the comments he received from Plaintiff's colleagues into his formal evaluation in addition to his own observations. (Def. App. at 3, ¶15). Mr. Rock wrote that although Plaintiff was "a good team player" who was "very helpful" on certain projects, including the BlackTie/StaticCheck evaluation, Plaintiff was "still growing as an AE3 but making good progress." *Id.* He wrote that Plaintiff's strengths were "[c]ustomer support, hard worker, team player, customer relationships"; his weaknesses were that he "needs to work on communication skills and be willing to get help from others" and that he was "[o]ften to [sic] defensive when others scrutinize his work." (Def. App. at 22). Mr. Rock's overall rating of Plaintiff's performance was "needs further development" and his performance potential was to "develop within role." *Id.*

In assessing annual performance reviews, Cadence establishes a distribution curve for overall performance ratings within a particular group; the top 20% are rated as "exceeds expectations," the

middle 70% are rated as "meets expectations," and the bottom 10% are rated as "needs further development" or "not achieving." (Def. App. at 3, ¶16). Plaintiff fell into this last group because, according to Mr. Rock, he was the poorest performing person on the team in 2003. (Def. App. at 3, ¶17).

Plaintiff strongly disagreed with his 2003 performance evaluation and expressed disbelief that he was not being promoted to the AE4 level. (Def. App. at 23). Plaintiff contends that the managerial discretion permitted in the distribution curve enables a supervisor to disguise a racial bias and assign disfavored employees to the bottom 10% without justification or on the basis of anonymous feedback. (Pl. App. at 6-7, ¶16). Plaintiff also contends that the concerns his peers expressed to Mr. Rock were unfounded, inappropriate, and inaccurate because they did not approach him first; he avers that Mr. Rock selectively targeted the Cadence peers who would provide negative feedback regarding Plaintiff's performance. (Pl. App. at 4-5, ¶¶12, 13). He also avers that he was never given the opportunity to provide feedback regarding the performance of his colleagues. (Pl. App. at 6, ¶15).

Because of Plaintiff's disagreement with the "needs further development" rating on his 2003 performance review, he requested, and received in March 2004, a reevaluation for what he believed to be a "definite mistake and oversight." (Def. App. at 23). In response to inquiries from Terri Rocha in HR, Mr. Rock stated that Plaintiff's evaluation was based not only on peer feedback but also on Plaintiff's need for additional training, need for improvement on evaluations, ineffective communication, and a need to be less defensive. (Def. App. at 4, ¶20; Def. App. at 51, 59-60). Following a four-hour meeting on March 4, 2004, in which Mr. Rock discussed the performance review with Plaintiff, Mr. Rock provided Plaintiff with a copy of the AE competency guidelines establishing what was expected for AE levels 1 through 6; he also suggested that Plaintiff work with

Terri Rocha in HR to address the concerns and feedback provided in the performance review. (Def. App. at 4, ¶¶20, 21, 22; Def. App. at 52-58).

The disagreements between Plaintiff, Mr. Rock, and HR over the performance review continued throughout March. Plaintiff expressed distrust in Terri Rocha because she was working with management, and in Mr. Rock because he would not guarantee a rating of "exceeds expectations" in future annual reviews even if Plaintiff did all that was asked of him. (Pl. App. at 8, ¶¶20, 21, 22; Def. App. at 72). To Plaintiff, Mr. Rock's refusal to guarantee a rating of "exceeds expectations" indicated discriminatory animus because Plaintiff "will always be black and some people's minds never change." (Pl. App. at 8, ¶22). Mr. Rock wanted to place Plaintiff on a "Performance Development Plan" to outline steps for Plaintiff to improve, and he repeatedly refused to release the names of Plaintiff's colleagues because they had been told the feedback they provided would be anonymous. (Def. App. at 4-5, ¶¶23, 26, 27). Terri Rocha supported Mr. Rock's refusal to release the names of Plaintiff's peers. (Def. App. at 90-95). Plaintiff was also upset that HR would not release the names of his colleagues who provided the feedback on his performance to Mr. Rock. (Pl. App. at 8-10).

Along with the reevaluation of his 2003 performance review, Plaintiff requested and received approval to be removed from the TI account in March 2004. (Def. App. at 4, ¶19; Def. App. at 50; Pl. App. at 7-8, ¶19). Plaintiff requested a different account in part because he believed he was unfairly blamed for the failures of others. (Pl. App. at 8, ¶19). In May of 2004, Mr. Rock initially suggested a project for a company called Dallas Semi; Bob Hilker, the Senior Sales Technical Leader, believed Dallas Semi would be a good opportunity for Plaintiff to use his skills and receive recognition from Cadence. (Def. App. at 6, ¶30; Def. App. at 100). Plaintiff refused the Dallas Semi assignment because he believed that AEs assigned to the account received negative feedback

and he did not want to be placed in a situation where failure was assured. (Def. App. at 100-03; Pl. App. at 11, ¶30). Mr. Hilker wrote to Mr. Rock that Plaintiff's lengthy written assessment of the Dallas Semi project evidenced a need for improvement in communication, specifically in targeting the correct audience and maintaining a positive attitude. (Def. App. at 100).

After Plaintiff declined to work on the Dallas Semi project, Mr. Rock attempted to find work for him outside of the Dallas area. (Def. App. at 6, ¶32; Pl. App. at 11, ¶32). However, he had difficulty finding an assignment for Plaintiff outside the Dallas area because Cadence employees told him that they either did not want to work with Plaintiff or they did not require the type of assistance Plaintiff could provide. (Def. App. at 6, ¶32). Mr. Rock assigned Plaintiff to a project in Austin, Texas, for a short time. *Id.* Plaintiff avers that Cadence employees at other locations were working closely with Mr. Rock and Ms. Sarice Plate from Cadence's HR department to sabotage his job performance, but he provides no evidence to support this claim in either his affidavit or appendix. (Pl. App. at 11-12, ¶32). He believes he was assigned to projects where it would seem he could not get along with anyone and "there was no way [he] would ever be treated with integrity at Cadence." *Id.*

On June 8, 2004, Mr. Rock met with Plaintiff and Ms. Plate for approximately two and a half hours to review a document entitled "Development Objectives" that Mr. Rock had been working on with HR since March of 2004. (Def. App. at 6, ¶31; Def. App. at 104-05). The Development Objectives document identified specific areas of opportunity and growth for Plaintiff to achieve over the next 60 days. *Id.* The next day, Plaintiff emailed Mr. Rock with his minutes from the June 8th meeting; the two exchanged emails over the course of the next several days regarding the accuracy of Plaintiff's minutes and the contents of the June 8 Development Objectives document. (Def. App. at 6, ¶31; Pl. App. at 11, ¶31; *see* Def. App. at 108-13). As a result of the 2003 performance review

and the June 8, 2004 Development Objectives meeting, Mr. Rock asked Plaintiff to perform practice demonstrations for his co-workers to test his knowledge and develop his skills. (Def. App. 6-7, ¶33; Def. App. at 115-16). Plaintiff contends that these practice demonstrations unfairly singled him out; he also contends that Mr. Rock and the reviewing co-workers selected unfinished software for the demonstrations to set Plaintiff up for failure. (Pl. App. at 12, ¶33). Mr. Rock provided the peer feedback from these sessions to Plaintiff, and Plaintiff dismissed the feedback as "bogus." (Def. App. at 7, ¶34; Pl. App. at 12-13, ¶34).

In October of 2004, Plaintiff was placed on disability leave due to a workplace injury to one or both of his hands. (Def. App. at 7, ¶37; Pl. App. at 13, ¶37). He returned to Cadence on a light-duty basis until he was terminated on February 17, 2005, as part of a company-wide reduction in force. (Def. App. at 7, ¶37; Def. App. at 235).

## II. PROCEDURAL HISTORY

On May 3, 2004, after the March 2004 reevaluation of his 2003 performance review but before the June 8, 2004 Development Objectives meeting, Plaintiff filed complaint number 310-2004-2933 with the Equal Employment Opportunity Commission ("EEOC"). (Def. App. at 130, 231; Resp. Br. at 34). The complaint alleged discrimination based on race and retaliation beginning on July 8, 2003, and continuing through the date of the complaint. (Def. App. at 231). Plaintiff identified the following discriminatory acts: not being assigned an office cubicle; receipt of racially inappropriate and degrading email messages; denial of a promotion, merit increases, and bonuses; retaliation for challenging his employment evaluation; and being singled out from other AEs to test his knowledge. *Id.* Plaintiff amended EEOC charge number 310-2004-2933 on January 18, 2005, to include additional allegations of discrimination based on race and retaliation regarding events that occurred through the date of the amendment. (Def. App. at 232).

The EEOC dismissed the 310-2004-2993 complaint and issued its notice of right to sue on June 29, 2005. (*Plaintiff's Original Complaint*, *Simmons v. Cadence Design Sys., Inc.*, No. 3:05-CV-1921-K (BH), at 9 (N.D. Tex. Sep. 27, 2005)). Plaintiff timely filed the instant suit *pro se*, alleging: (1) race harassment and hostile environment; (2) violation of 42 U.S.C. § 1981; (3) violation of the Americans with Disabilities Act (ADA); and (4) retaliation. (*Id*. at 3-7). On January 25, 2005, Plaintiff amended his complaint and dropped his ADA and retaliation claims. (*See Plaintiff's First Amended Complaint*, at 3-6). Remaining before the Court are the race harassment, hostile environment, and § 1981 claims. Plaintiff's claims relating to the work-related injury he suffered in October of 2004 or his February 2005 termination by Cadence are not at issue in this action.[3]

### III. STANDARD OF REVIEW

Summary judgment is appropriate when the pleadings and evidence on file show that no genuine issue exists as to any material fact and that the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c). "[T]he substantive law will identify which facts are material." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Id.* The movant makes a showing that there is no genuine issue of material fact by informing the court of the basis of its motion and by identifying the portions of the record which reveal there are no genuine material fact issues. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The pleadings, depositions, answers to interrogatories, admissions, and affidavits, if any, must demonstrate that no genuine issue of material fact exists. FED. R. CIV. P. 56(c).

---

[3]Plaintiff filed a separate EEOC complaint, number 310-2005-3542, on June 6, 2005, concerning his termination, which is the subject of another federal action. *See Simmons v. Cadence Design Sys., Inc.*, No. 3:07-CV-1029-M (BF) (N.D. Tex. Jun. 11, 2007).

Once the movant makes this showing, the non-movant must then direct the court's attention to evidence in the record sufficient to establish that there is a genuine issue of material fact for trial. *Celotex*, 477 U.S. at 324. To carry this burden, the non-movant "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Instead, the non-movant must show that the evidence is sufficient to support a resolution of the factual issue in his favor. *Anderson*, 477 U.S. at 249.

While all of the evidence must be viewed in a light most favorable to the motion's opponent, *id.* at 255 (*citing Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158-59 (1970)), neither conclusory allegations nor unsubstantiated assertions will satisfy the non-movant's summary judgment burden. *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir.1994) (en banc); *Topalian v. Ehrman*, 954 F.2d 1125, 1131 (5th Cir. 1992). Summary judgment in favor of the movant is proper if, after adequate time for discovery, the motion's opponent fails to establish the existence of an element essential to his case and as to which he will bear the burden of proof at trial. *Celotex*, 477 U.S. at 322-23. "The party opposing summary judgment is required to identify specific evidence in the record and to articulate the precise manner in which that evidence supports his claim." *Ragas v. Tenn. Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998).

## IV. ANALYSIS

### A. Racial Discrimination

Defendant first moves for summary judgment on Plaintiff's claims of racial discrimination under 42 U.S.C. § 1981. (Mot. Br. at 12). The allegedly discriminatory acts at issue in Plaintiff's complaint of racial discrimination include: (1) managing Plaintiff differently than non-minority employees; (2) consistently subjecting Plaintiff to close scrutiny and counseling with respect to his

job performance; (3) subjecting Plaintiff to greater performance requirements and expectations than his non-minority peers; (4) reduced compensation through interference with Plaintiff's ability to earn bonuses by assigning him to less profitable projects; and (5) ignoring Plaintiff's complaints of disparate treatment based on his race. *See Plaintiff's First Amended Complaint*, at 2-3. Plaintiff also alleges that (6) Defendant discriminated against him when he was not promoted from the AE3 level to the AE4 level after his 2003 performance review. (*See* Mot. Resp. at 48-49).

### 1. Framework

Section 1981 claims for racial discrimination in the employment context are analyzed under the same well established burden-shifting paradigm as Title VII claims. *Jenkins v. Methodist Hosps. of Dallas, Inc.*, 478 F.3d 255, 260 (5th Cir. 2007). In the context of a Title VII/ § 1981 race discrimination claim, "the plaintiff must establish by a preponderance of the evidence a *prima facie* case of discrimination." *Nichols v. Lewis Grocer*, 138 F.3d 563, 566 (5th Cir. 1998). A plaintiff may establish a *prima facie* case of racial discrimination through either direct evidence, statistical proof, or the test established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Urbano v. Continental Airlines, Inc.*, 138 F.3d 204, 206 (5th Cir. 1998). Under the framework set forth in *McDonnell Douglas*, a plaintiff must show that he (1) belongs to a protected group; (2) was qualified for his position; (3) suffered an adverse employment action; and (4) was replaced by or was treated less favorably than a similarly qualified individual outside the protected class. *See McDonnell Douglas*, 411 U.S. at 802.

If the plaintiff establishes a *prima facie* case, an "inference of intentional discrimination" arises. *LaPierre v. Benson Nissan, Inc.*, 86 F.3d 444, 448 (5th Cir. 1996). The burden of production then shifts to the defendant to articulate a legitimate, non-discriminatory reason for the challenged employment action. *Okoye v. Univ. of Texas Houston Health Science Ctr.*, 245 F.3d 507, 512 (5th

- 12 -

Cir. 2001) (citing *Reeves v. Sanderson Plumbing Prods. Inc.*, 530 U.S. 133, 142 (2000)). Once the defendant has met its burden of production and responded with a legitimate, non-discriminatory reason for the employment action,

> the plaintiff must then offer sufficient evidence to create a genuine issue of material fact either (1) that the defendant's reason is not true, but is instead a pretext for discrimination (pretext alternative); or (2) that the defendant's reason, while true, is only one of the reasons for its conduct, and another motivating factor is the plaintiff's protected characteristic (mixed-motive[s] alternative).

*Keelan v. Majesco Software, Inc.*, 407 F.3d 332, 341 (5th Cir. 2005) (citing *Rachid v. Jack in the Box, Inc.*, 376 F.3d 305, 312 (5th Cir. 2004)). Under the pretext alternative, the plaintiff must introduce "some evidence, whether circumstantial or direct, that permits the jury to believe that the reason was false and that illegal discrimination was the actual reason." *Nichols*, 138 F.3d at 566. Under the mixed-motive alternative, a plaintiff need only present sufficient evidence for a reasonable jury to conclude that the protected characteristic was a motivating factor for the employment practice; direct evidence is not needed. *Desert Palace*, 539 U.S. at 101. However, "[t]he question of pretext versus mixed-motive treatment is only reached after a plaintiff has met his *prima facie* showing under the modified *McDonnell Douglas* standard and the defendant has responded with a legitimate nondiscriminatory reason." *Keelan*, 407 F.3d at 341.

### 2. Claims 1, 2, 3, and 5

Defendant contends that Plaintiff cannot establish an adverse employment action or less favorable treatment, the third and fourth prongs, respectively, of the *McDonnell Douglas* test for a *prima facie* case.[4] (Mot. Br. at 15).

---

[4]Because Plaintiff alleges neither direct evidence nor statistical proof in support of his claim for racial discrimination, he must present a *prima facie* case through the test established by the Supreme Court in *McDonnell Douglas*. *See Urbano*, 138 F.3d at 206. Although Plaintiff claims that Defendants had a pattern or practice of discrimination against African-Americans, (Mot. Resp. at 52, 54), pattern or practice evidence should not be applied to individual claims of discrimination at the summary judgment stage, *Celestine v. Petroleos de Venezuela, S.A.*, 255

A defendant can meet its summary judgment obligation by pointing the court to the absence of evidence to support a required element of a plaintiff's case. *See Keeley v. Cisco Sys.*, 2003 WL 21919771, *3 (N.D. Tex. Aug. 8, 2003) (Fitzwater, J.) (noting that although the defendant did not explicitly argue that plaintiff had failed to establish a *prima facie* case, the defendant had satisfied its summary judgment burden by pointing to the absence of evidence to support one prong of the *prima facie* case) (citing *Celotex Corp.*, 477 U.S. at 325). This is because the defendant will not have the burden at trial concerning the elements of the plaintiff's *prima facie* case. *Id.*

In the Fifth Circuit, "an employment action that does not affect job duties, compensation, or benefits is not an adverse employment action." *Pegram v. Honeywell, Inc.*, 361 F.3d 272, 282 (5th Cir. 2004) (citations omitted). Rather, an adverse employment action consists of "ultimate employment decisions" such as hiring, granting leave, discharging, promoting, demoting, and compensating. *Id.* Claims 1, 2, 3, and 5 (raised in Plaintiff's *First Amended Complaint*) of differential management, unwarranted job performance scrutiny, performance requirement standards, and ignoring complaints of disparate treatment, are not adverse employment actions as a matter of law because they are not "ultimate employment decisions." *See id.*; *see First Amended Complaint*, at 2-3. Plaintiff's allegations of racial discrimination – not being assigned an office cubicle, the allegedly offensive emails, and the requirement after his 2003 performance review that he perform practice demonstrations to test his knowledge of Cadence applications – are also not ultimate employment decisions as a matter of law.[5]

---

F.3d 343, 356 (5th Cir. 2001).

[5]Although not raised in his *First Amended Complaint*, Plaintiff's sworn affidavit also raises the possibility of an allegation of an adverse employment action in his assignment to projects outside of Dallas. (*See* Pl. App. at 11-12, ¶32). It is undisputed that Plaintiff himself requested to be removed from the TI project and refused to be assigned to the Dallas Semi project. (Pl. App. at 7-8, ¶19; Pl. App. at 11-12, ¶¶30, 32; Def. App. at 4, ¶19; Def. App. at 6, ¶30). Moreover, a lateral transfer, without objective evidence that the transfer caused harm, is not an

Additionally, a poor performance review is not an "ultimate employment decision" either, and therefore cannot be an adverse employment action for purposes of a Title VII racial discrimination claim. *Mattern v. Eastman Kodak* Co., 104 F.3d 702, 708 (5th Cir. 1997) (disciplinary filings, supervisor reprimands, and poor performance by the employee are unwarranted expansions of the definition of an adverse employment action) (abrogated on other grounds by *Burlington Northern and Santa Fe Ry. v. White*, 126 S.Ct. 2405 (2006));[6] *Dixon v. Moore Wallace, Inc.*, 2006 WL 1949501, at *9 (N.D. Tex. July 13, 2006) (Fitzwater, J.) (poor performance evaluation as a matter of law does not qualify as an adverse employment action).

Accordingly, the Court finds that Plaintiff has not established a *prima facie* case of racial discrimination for claims 1, 2, 3, and 5, as listed in Part IV.A, *supra*, because he has not shown he suffered an adverse employment action.[7]

### 3. Claims 4 and 6

With respect for Plaintiff's claims 4 and 6, reduced compensation and failure to promote, Defendant contends that Plaintiff cannot establish a *prima facie* case because he cannot show that either of these is an adverse employment action or that he received less favorable treatment than similarly situated employees outside his protected class. (Mot. Br. at 15, 17). However, both reduced compensation and failure to promote are actionable adverse employment actions. *Pegram*,

---

adverse employment action. *Pegram*, 361 F.3d at 283. Plaintiff produced no evidence that his reassignment to Cadence projects outside of Dallas caused harm, and his subjective preference for one position over another is an insufficient basis to find an adverse employment action for the purposes of summary judgment. *Id.*

[6] *Burlington Northern* changed the standard for "adverse employment actions" in retaliation claims, but it did not change the standard for discrimination claims. *McCoy v. City of Shreveport*, 492 F.3d 551, 559 (5th Cir. 2007); *Dixon*, 2006 WL 1949501, at *8 n. 13.

[7] Because Plaintiff's *prima facie* case necessarily fails due to his inability to show an adverse employment action for claims 1, 2, 3, and 5, the Court need not consider whether Plaintiff can establish the fourth prong of less favorable treatment with respect to these claims. *McDonnell Douglas*, 411 U.S. at 802; *Celotex Corp.*, 477 U.S. at 325.

361 F.3d at 282. Plaintiff does not explicitly state that similarly situated employees outside his protected class received more favorable treatment, but given that he was one of the few African-American AE's at Cadence and his repeated sworn allegations that he was "singled out," the Court finds that he has shown evidence sufficient to create a fact issue on this fourth element of a *prima facie* case on these two claims.

The burden now shifts to Defendant to articulate a legitimate, non-discriminatory reason for the employment actions. *Okoye*, 245 F.3d at 512. Defendant contends that compensation at Cadence consists of both base salary and incentive bonus opportunities. (Def. App. at 7, ¶35). Even if Plaintiff was promoted to the AE4 level, there was never a guarantee that his salary would increase because the pay grades for the AE3 and AE4 levels overlap. (Mot. Br. at 14, n.11; Def. App. at 4, ¶21). Bonuses are determined through a combination of individual, team, and overall company performance; specific project assignments do not necessarily impact bonuses because of the presence of other factors. (Def. App. at 7, ¶35). As for failure to promote, Defendant contends that there was not a promotion available for which Plaintiff applied and was rejected. (Mot. Br. at 16, n. 13). Even if there were a promotion available, Defendant contends that Plaintiff was not qualified to advance to the AE4 level. *Id*.; Def. App. at 3, ¶17.

The foregoing explanations are legitimate, non-discriminatory responses to Plaintiff's claims of reduced compensation and failure to promote. Since Defendants have met their burden of production, the burden shifts back to Plaintiff to offer sufficient evidence to create a genuine issue of material fact that Defendant's explanations were either a pretext or part of a mixed motive for racial discrimination. *Keelan*, 407 F.3d at 341.

As for Plaintiff's claim 4, that of reduced compensation, Plaintiff presents no evidence that his work assignments reduced his potential to earn a bonus or that his salary would have increased

if he had been promoted from AE3 to AE4. (*See* Pl. App. at 13, ¶35); *cf. Pegram*, 361 F.3d at 284 (finding a genuine issue of material fact because plaintiff presented sufficient evidence of a change in compensation between two different sales positions and thus established the possibility of a demotion). In place of evidence, Plaintiff opines that because his job performance was self-assessed as "outstanding," he should have received a salary increase and a promotion to the AE4 level after his 2003 performance review. (Mot. Resp. at 50).

With regards to claim 6, the failure to promote, Plaintiff does not argue that there was a position available for which he applied and was rejected. Instead, his pleadings make clear that he believes he was unfairly denied a change in title from AE3 to AE4 after undergoing the 2003 performance review. (Mot. Resp. at 48-49). The 2003 performance review established that Plaintiff was "still growing as an AE3" and thus not yet qualified to work as an AE4; Defendant's assessment of Plaintiff's abilities was clarified in the email exchange that took place between Plaintiff and Mr. Rock on March 4 and 5, 2004. (Def. App. at 21, 52-55). Plaintiff presents no evidence that he was qualified to work at the AE4 level, which requires, among other things, a strong technical knowledge of company products and 5 to 8 years of experience. (*See* Def. App. at 57, 331) (listing the duties and requirements of an AE4). Instead, Plaintiff offers his own self-serving, conclusory assertion that he was qualified for the AE4 level and that he received positive feedback from co-workers about his work as an AE3. (Mot. Resp. at 49; Pl. App. at 2, ¶10). However, even if Plaintiff's claims of positive feedback from co-workers are true, they do not show that he was qualified to advance to the AE4 level.

In sum, the majority of Plaintiff's claims of racially discriminatory acts fail as a matter of law because they are not adverse employment actions. For the two claims for which Plaintiff established a *prima facie* case of discrimination - reduced compensation and failure to promote -

Plaintiff has not produced *any* evidence necessary to establish that Defendant's proffered explanations were either a pretext or a motive for racial discrimination. Throughout his pleadings, Plaintiff offered vague, unsubstantiated, and conclusory allegations of "evidence" in support of his claims; however, Plaintiff's conclusory statements are not competent summary judgment evidence, *Little*, 37 F.3d at 1075, and the time to present evidence beyond a metaphysical doubt as to the material facts has passed. *Matsushita*, 475 U.S. at 586. Because Plaintiff cannot establish a *prima facie* case for four of his claims and lacks of evidence of a pretext or mixed motive for the remaining two claims, summary judgment in favor of the Defendant on the claim of racial discrimination under Title VII/ § 1981 is proper. *Celotex*, 477 U.S. at 322-23.

## B. Racial Harassment and Hostile Work Environment

The Court next considers Defendant's motion for summary judgment on Plaintiff's claims of racial harassment and hostile work environment. Plaintiff presents his allegations of racial harassment and hostile work environment as a single cause of action. (*First Amended Complaint*, at 3-4). The allegations at issue in Plaintiff's claim of racial harassment and hostile work environment include: (1) the lack of a cubicle assignment; (2) inappropriate and derogatory comments, including email messages; (3) assignment to less beneficial projects than similarly situated non-Black co-workers; (4) poor performance review and bonus compensation; and (5) the requirement that Plaintiff demonstrate his knowledge of Cadence applications to co-workers. (*See First Amended Complaint*, at 3-4; Mot. Resp. at 56-61). Plaintiff also alleges that (6) he was assigned an unreasonable amount of work that ultimately resulted in his claim of a workplace injury. (Mot. Resp. at 57). Defendant contends that Plaintiff's vague and conclusory allegations are insufficient to satisfy his burden of proof. (Mot. Br. at 21-22).

### 1. *Framework*

To establish a *prima facie* case of racial harassment under Title VII, Plaintiff must show that: (1) he belongs to a protected group; (2) he was subjected to unwelcome harassment; (3) the harassment complained of was based on the protected classification; (4) the harassment complained of affected a term, condition, or privilege of employment; and (5) the employer knew or should have known of the harassment in question and failed to take prompt remedial action. *See Celestine*, 266 F.3d at 353. If the harassment is "allegedly committed by a supervisor with immediate (or successively higher) authority over the harassment victim, the plaintiff employee needs only to satisfy the first four elements." *Id*. (citing *Faragher v. City of Boca Raton*, 524 U.S. 775, 807 (1998)).

For harassment on the basis of race to support a hostile work environment claim under Title VII, it must be "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993). Although "[d]iscriminatory verbal intimidation, ridicule, and insults may be sufficiently severe or pervasive" to support evidence of a Title VII violation, *DeAngelis v. El Paso Mun. Police Officers Ass'n*, 51 F.3d 591, 593 (5th Cir. 1995), "simple teasing, offhand comments, and isolated incidents, (unless extremely serious) will not amount to discriminatory charges" that can survive summary judgment. *Hockman v. Westward Communications, LLC*, 407 F.3d 317, 328 (5th Cir. 2004). Instead, the Fifth Circuit uses a totality-of-the-circumstances test to determine whether a workplace constitutes a hostile work environment; the test focuses on: "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Ramsey v. Henderson*, 286 F.3d 264, 268 (5th Cir. 2002) (citing *Walker v. Thompson*, 214 F.3d 615, 625 (5th

Cir. 2000)).  The high standard for the above inquiries serves to ensure that Title VII does not become a "general civility code."  *Faragher*, 524 U.S. at 788.

### 2. Racial Harassment

Defendants contend Plaintiff is unable to establish the third and fourth elements of his *prima facie* case, that the harassment complained of was based on the protected classification of race or that the harassment complained of affected a term, condition, or privilege of employment.[8]  (*See* Mot. Br. at 22-26).

Plaintiff's six specific complaints lack any rational connection to the protected classification of race and instead border on frivolous arguments.  For claims 1, 3, 4, 5, and 6, he presented no evidence - other than his own subjective beliefs - to show how any of these five incidents were based on race.  Since subjective beliefs are not sufficient to create a genuine issue of material fact, Plaintiff cannot establish a *prima facie* case of racial harassment.  *See Haley v. Alliance Compressor LLC*, 391 F.3d 644, 651 (5th Cir. 2004); *Grimes v. Texas Dept. of Mental Health and Mental Retardation*, 102 F.3d 137, 140 (5th Cir. 1996).  As for claim 2, Plaintiff's allegation of multiple derogatory email messages, only the July 9, 2003 email updating Aesop's fable of the ant and the grasshopper is supported by the evidentiary record and is relevant to his claim for racial harassment.[9]  However, even this claim fails because the racially harassing nature of the email is tenuous and is based on Plaintiff's own subjective belief.  Plaintiff alleged that other African-Americans at Cadence were offended by the email, but he presented no evidence, such as an affidavit from a co-worker, to

---

[8]It is undisputed that Plaintiff belongs to a protected group.  Defendant does not address whether the actions of which Plaintiff complains were unwelcome.

[9]Plaintiff does not provide any examples of other "jokes" sent by Mr. Rock (*see* Pl. App. at 1, ¶9); these allegations are vague and unsubstantiated by the summary judgment record.  *Celotex*, 477 U.S. at 324.  Plaintiff cannot maintain a claim for a hostile work environment based on the August 12, 2003 email he believed was misogynistic because he is not a woman.  *See Celestine*, 266 F.3d at 353.

support this claim. Indeed, when pressed at his own deposition, Plaintiff could not articulate a racial connection in the email message beyond his own subjective belief. (*See* Def. App. at 147-49). Because Plaintiff has not shown how the harassment of which he complained was based on the protected classification of race, he has not established the third element of a *prima facie* case of racial harassment.[10] *Haley*, 391 F.3d at 651; *Celestine*, 266 F.3d at 353.

In addition to showing that Plaintiff cannot establish a *prima facie* case of racial harassment, Defendant proffered evidence of legitimate, non-discriminatory reasons for the employment actions of which Plaintiff complains. For example, the decision not to assign Plaintiff a cubicle was based on his designation as a "home office" employee who did not report to the Plano office every day, not because he is African-American. (Def. App. at 2, ¶7). Likewise, the decision to move Plaintiff off of the TI project and onto projects that Plaintiff characterized as "less beneficial" resulted from his own request; he was sent to Austin only after he refused the assignment to Dallas Semi. (Pl. App. at 7, 10-11, ¶¶19, 30). As for the allegedly harassing knowledge and skill tests, Plaintiff was required to perform these as a result of his poor performance review, repeated requests to know what he needed to do to improve, and the May 2004 Development Objectives meeting with HR. (Def. App. 6-7, ¶33; Def. App. at 115-16). Plaintiff refutes these legitimate, non-discriminatory explanations not with evidence, but with a reiteration of conclusory and self-serving statements of his own subjective beliefs.

Although Plaintiff identified a number of incidents in support of his claim for racial harassment, when assessed according to the standards set forth in Part IV.B.1, *supra*, none of

---

[10]Because Plaintiff has not established the third element of his *prima facie* case, the Court need not consider whether the harassment complained of affected a term, condition, or privilege of employment. The Court notes, however, that Plaintiff has not shown that the isolated incidents described claims 1 - 6 were sufficiently pervasive or severe so as to constitute racial harassment. *Ramsey*, 286 F.3d at 268.

Plaintiff's complaints establish a *prima facie* case of racial harassment. Plaintiff has failed to produce any evidence that would permit a reasonable trier of fact to find that any of the identified incidents were based upon the protected classification of race. *Ramsey*, 286 F.3d at 268. His own subjective belief that the perceived treatment was based on his race is not sufficient to create a genuine issue of material fact. *See Haley*, 391 F.3d at 651; *Grimes*, 102 F.3d at 140. Moreover, Plaintiff did not refute Defendant's legitimate, non-discriminatory reasons for the actions. Summary judgment in favor of Defendants should therefore be granted on this claim. *Celestine*, 266 F.3d at 353; *Celotex*, 477 U.S. at 322-23.

### 3. Hostile Work Environment

As stated previously, Plaintiff relies on the same allegations to support both his claim of racial harassment and of hostile work environment. (*First Amended Complaint*, at 3-4). In addition to not being able to show how claims 1 - 6 were racially discriminatory, the actions of which Plaintiff complains were sporadic, mild, and did not interfere with Plaintiff's work performance. While Plaintiff was offended by the email message updating Aesop's fable, at most it was a mere offensive utterance, not a "steady barrage of opprobrious racial comments." *Mims v. Carrier Corp.*, 88 F.Supp.2d 706, 715 (E.D. Tex. 2000). Thus, under the Fifth Circuit's totality-of-the-circumstances test, Plaintiff has not shown that the workplace at Cadence was a hostile work environment. *Ramsey*, 286 F.3d at 268. The isolated incidents and offhand comments of which Plaintiff complains do not amount to discriminatory charges that can survive summary judgment. *Hockman*, 407 F.3d at 328. Accordingly, summary judgment in favor of Defendant should be granted on Plaintiff's claim of hostile work environment.

### V. CONCLUSION

For the reasons stated above, the Court recommends that *Defendant's Motion for Summary*

*Judgment* be **GRANTED**, and that Plaintiff's claims of racial discrimination, racial harassment, and hostile work environment be dismissed, with prejudice.

       **SO RECOMMENDED** on this 26th day of October, 2007.

                                     **IRMA CARRILLO RAMIREZ**
                                     **UNITED STATES MAGISTRATE JUDGE**

## INSTRUCTIONS FOR SERVICE AND
## NOTICE OF RIGHT TO APPEAL/OBJECT

       Pursuant to Title 28, United States Code, Section 636(b)(1), any party who desires to object to these findings, conclusions and recommendation must file and serve written objections within ten (10) days after being served with a copy. A party filing objections must specifically identify those findings, conclusions or recommendation to which objections are being made. The District Court need not consider frivolous, conclusory or general objections. A party's failure to file such written objections to these proposed findings, conclusions and recommendation shall bar that party from a *de novo* determination by the District Court. *See Thomas v. Arn*, 474 U.S. 140, 150 (1985)*; Perales v. Casillas*, 950 F.2d 1066, 1070 (5th Cir. 1992). Additionally, any failure to file written objections to the proposed findings, conclusions and recommendation within ten (10) days after being served with a copy shall bar the aggrieved party from appealing the factual findings and legal conclusions of the Magistrate Judge that are accepted by the District Court, except upon grounds of plain error. *Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1428–29 (5th Cir. 1996) (en banc).

                                   IRMA CARRILLO RAMIREZ
                                   UNITED STATES MAGISTRATE JUDGE